UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

BENJAMIN FRANKLIN HOOKS,

                Plaintiff,

v.                                                                  Case No. 22-CV-811

KATRINA L. DORROW-STEVENS[1], *et al.*,

                Defendants.

## DECISION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Benjamin Franklin Hooks, who is incarcerated and representing himself, brings this lawsuit under 42 U.S.C. § 1983. Hooks was allowed to proceed on an Eighth Amendment conditions of confinement claim against defendants Katrina L. Dorow-Stevens, Drew Weycker, and Michael Cole for allegedly denying him a mattress for six days and forcing him to sleep on cement. (Docket # 16.)

The defendants filed a motion for summary judgment, which is fully briefed and ready for a decision. (Docket # 36.) The parties have consented to the jurisdiction of a magistrate judge. (Docket # 6, Docket # 24.) For the reasons stated below, the court grants the defendants' motion for summary judgment.

## FACTS

At all times relevant, July 31, 2019 through August 5, 2019, Hooks was incarcerated at Green Bay Correctional Institution (GBCI). (Docket # 38, ¶ 1.) Defendant Dorow-

---

[1] Although Hooks spells Defendant's last name "Dorrow-Stevens," it appears her last name is spelled Dorow-Stevens. (Docket # 25.)

Stevens was a Psychological Associate at GBCI, working in the Psychological Services Unit (PSU), and her duties included mental health screening, counseling, monitoring, crisis intervention and prevention, and deciding whether a prisoner needed to be placed in clinical observation status. (*Id.*, ¶¶ 2-3.) Cole and Weycker were corrections officers and were working in the observation status unit during the relevant time period. (*Id.*, ¶¶ 4-5.)

On July 31, 2019, Dorow-Stevens visited with Hooks after he made suicidal statements to security staff. (*Id.*, ¶¶ 8-10.) Hooks told Dorow-Stevens that he was having suicidal thoughts and had "felt suicidal for a long time." (*Id.*, ¶ 10.) He would not promise that he'd keep himself safe and he would not tell Dorow-Stevens any more details about his suicidal thoughts or his plan. (*Id.*, ¶ 11.) As a result, Dorow-Stevens placed Hooks in clinical observation status. (*Id.*, ¶ 12.)

Once he was placed in clinical observation status, Hooks was given a security kilt to cover himself with. (*Id.*, ¶ 20.) He was placed into a cell that had a sink, a toilet, a concrete "desk/shelf," and a concrete bed that was approximately 32 inches by 75 inches and 30 inches off the ground. (*Id.*, ¶ 23.) At PSU staff discretion, a prisoner in observation status also may be given additional suicide-resistant clothing, a security mat/mattress, bar or liquid soap and a washcloth, bag meals, and toilet paper. (*Id.*, ¶ 26.) If any items are withheld, PSU staff review the restriction each time they visit the prisoner. (*Id.*, ¶ 27.)

Dorow-Stevens asserts that Hooks should have received a security mat in addition to the security kilt when he was placed in observation status. (*Id.*, ¶ 34.) It is undisputed that Hooks did not receive the security mat. (*Id.*, ¶ 35.) While Dorow-Stevens made the decision whether Hooks may have a security mat, she asserts that she was not responsible for actually giving a mat to Hooks. (*Id.*, ¶ 36.) Security staff in the Restricted Housing Unit

(RHU) were responsible for ensuring Hooks had a mat. (*Id.*) Dorow-Stevens also did not explicitly specify that he should receive a mat in her placement directions because "she assumed he would receive a security mat because this is a standard starting property for any inmate that is placed in clinical observation status." (*Id.*, ¶ 37.) Dorow-Stevens did not instruct that Hooks be denied a security mat. (*Id.*, ¶ 38.)

Hooks states that Dorow-Stevens only specified that he receive a security kilt, and as a result, he did not receive a security mat, soap, washcloth, or toilet paper. (Docket # 51 at 13.) Hooks further asserts that he was placed in an observation cell that had cold air blowing out of the vents and he had to use his bare hands and water to clean himself after he defecated. (*Id.* at 6.) Because he had no soap, his hands remained filthy. (*Id.*)

On July 31, 2019, Cole was working in the RHU, including the observation status wing, as the second-shift line supervisor. (Docket # 38, ¶ 39.) Part of his duties were to complete checks of prisoners in observation status at least twice during an eight-hour shift. (*Id.*, ¶ 41.) At approximately 5:00 p.m., it was reported that Hooks was covering the window into his cell with his kilt. (*Id.*, ¶ 44.) At 5:15 p.m., Cole and Weycker, who was recently promoted to supervisor and was shadowing Cole to learn the duties of his new position, stopped at Hooks' cell. (*Id.*, ¶¶ 46–47.) They observed that "Hooks was 'sitting on floor/had window covered due to not having a mattress/asked for mattress.'" (*Id.*, ¶ 48.) Cole did not immediately give Hooks a mattress because he was misusing his kilt to partially cover his cell window, so it was likely that Hooks would also misuse the mattress to fully cover his cell window. (*Id.*, ¶ 49.) Cole also assumed, but did not verify, that PSU staff had determined that Hooks was not allowed a mattress at that time. (*Id.*, ¶ 50.)

3

At 11:30 p.m. on July 31, Cole checked on Hooks again, and observed that Hooks was lying on the floor, but could be seen moving. (*Id.*, ¶ 53.) Hooks did not ask for a security mat. (*Id.*, ¶ 54.) This was the last interaction Cole had with Hooks during the relevant time period because he was on vacation for the remainder of the time period and not at work. (*Id.*, ¶¶ 56–57.)

On August 1, 2019, Dorow-Stevens visited Hooks and attempted to perform a follow-up assessment, but Hooks refused to cooperate. (*Id.*, ¶ 58.) As a result, Dorow-Stevens determined that Hooks should remain in observation status because she could not assess his mental health. (*Id.*) Immediately prior to her visit to Hooks' cell, security staff informed Dorow-Stevens that "security staff had removed some property due to Hooks' behavior the night before." (*Id.*, ¶ 62.) However, Dorow-Stevens was not told what specific property had been removed. (*Id.*) She further assumed that security staff would consult with PSU staff to determine if Hooks could be given property back. (*Id.*) While at his cell, because of Hooks' position, she did not notice that he did not have a security mat. (*Id.*, ¶ 63.) Dorow-Stevens also asserts that security staff never informed her that Hooks asked for a security mat or additional property. (*Id.*, ¶ 64.) Dorow-Stevens did not interact with Hooks again until August 5, 2019. (*Id.*, ¶ 65.)

As for why Hooks had additional property restrictions, on August 1, Hooks covered the vents in his cell with part of his security kilt and parts of his bagged meal, because the vents were blowing cold air and he was freezing. (Docket # 38, ¶ 76; Docket # 51 at 5–6.) As a result, non-defendants Captain Daniel Cushing and Lieutenant David McCrory ordered Hooks to remove the vent coverings. (Docket # 38, ¶ 77.) When Hooks refused, Cushing and McCrory assembled a cell extraction team to remove Hooks from the cell and

to uncover the vents. (*Id.*, ¶ 77.) Hooks then agreed to comply and allowed officers to come in and clear the vents. (*Id.*, ¶¶ 79–81.) Hooks was placed back in his cell, but Cushing determined that Hooks' kilt needed to be confiscated because he was misusing it. (*Id.*, ¶ 82.) Hooks was not given the kilt back until August 3, 2019, when a non-defendant captain determined he could have it back because it was no longer a safety and security risk. (*Id.*, ¶ 84.) None of the defendants were involved in these decisions.

On August 2, 2019, during a routine safety check, Weycker visited Hooks' cell at approximately 6:44 p.m. (*Id.*, ¶ 85.) Hooks asked Weycker for his property. (*Id.*, ¶ 86.) However, Weycker was not authorized to give Hooks any additional property, and PSU staff had already left for the day, so he could not get permission from them. (*Id.*, ¶¶ 87–88.)

On August 3, 2019, Weycker again stopped at Hooks' cell twice for routine safety checks. (*Id.*, ¶ 89.) During the first check, Hooks was sleeping on the bed, so he did not interact with Weycker. (*Id.*, ¶¶ 90–91.) During the second check, Hooks was still lying on the bed but did not ask Weycker for a security mat or any additional property. (*Id.*, ¶¶ 93–94.) Hooks asserts that Weycker should have noticed his lack of a security mat and took it upon himself to look into why Hooks did not have a security mat or any other property. (Docket # 51 at 12.) Weycker was not on duty during the remainder of the relevant time period, so this was his last interaction with Hooks. (Docket # 38, ¶¶ 95–96.)

On August 5, 2019, Dorow-Stevens assessed Hooks again. (*Id.*, ¶ 65.) At that time, Hooks asked why he did not have a security mat. (*Id.*, ¶ 66.) Dorow-Stevens responded that his access to property was limited due to his behavior. (*Id.*, ¶ 66.) Hooks informed her that while that may be the case, he should at least have had a security mat. (*Id.*) Dorow-Stevens replied that he should have asked PSU staff if he wanted additional property, and because

5

he did not do so, he did not receive additional property privileges. (*Id.*, ¶ 67.) During the visit, Dorow-Stevens determined that Hooks could be released from observation status because he no longer showed signs of suicidal tendencies. (*Id.*, ¶ 68.)

Hooks maintains that the defendants had a duty to investigate why he did not have a security mat and they failed to do so. (Docket # 51 at 12–13.) He argues that they should have been put on notice because the observation log noted he did not have a security mat and had been asking for one. (Docket # 48, ¶¶ 42–49.) Hooks also states that as a result of sleeping on the floor, he suffered prolonged back pain that was treated with over-the-counter pain medication and physical therapy. (*Id.*, ¶¶ 32–41.)

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. The mere existence of some factual dispute does not defeat a summary judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*,

477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## ANALYSIS

Hooks claims that the defendants violated his Eighth Amendment rights because they did not provide him with a security mat for his six-day stay in observation status. Hooks also argues that his constitutional rights were violated because he was placed in a freezing cell with no soap, toilet paper, or clothing for that six-day period. Unfortunately, Hooks did not allege these conditions in his complaint, and at screening he was permitted only to proceed on an Eighth Amendment conditions of confinement claim as it relates to the lack of a mattress. Hooks is limited to the scope of the screening order, so the court cannot consider these additional alleged conditions. *See Werner v. Hamblin*, Case No. 12-C-0096, 2013 WL 788076 at *2 (E.D. Wis. March 1, 2013).

"The Eighth Amendment can be violated by conditions of confinement in a jail or prison when (1) there is a deprivation that is, from an objective standpoint, sufficiently serious that it results 'in the denial of the minimal civilized measure of life's necessities' and (2) where prison officials are deliberately indifferent to this state of affairs." *Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016).

"According to the Supreme Court . . . 'extreme deprivations are required to make out a conditions-of-confinement claim." *Giles v. Godinez*, 914 F.3d 1040, 1051 (7th Cir. 2019) (quoting *Hudson v. McMillian*, 503 U.S. 1, 9, (1992)). The Seventh Circuit Court of Appeals has explicitly held that "[s]leeping for three days on a bedframe without a mattress is not extreme" even where the plaintiff "sought medical treatment for a sore back because of the sleeping arrangements." *Stephens v. Cottey*, 145 Fed. App'x 179, 181 (7th Cir. 2005). Other district courts throughout the Seventh Circuit have determined that sleeping on the floor or a hard surface for several days or even months does not constitute an extreme deprivation. *See Grisson v. Watson*, Case No. 21-cv-274-JPG, 2023 WL 2263636 (S.D. Ill. Feb. 28, 2023) (finding that a plaintiff who had to sleep for 16 days in a hard stackable plastic bunk did not suffer an extreme deprivation); *Holton v. Tharp*, 20-cv-1136-RJD, 2024 WL 688609 at *5 (S.D. Ill., Feb 20, 2024) (holding that a plaintiff who had to sleep on the floor for two separate periods of four months, while unpleasant, "did not lead to intolerable conditions, deprive him of one of life's necessities, or expose him to a substantial risk of harm"). As such, it is clear here that Hooks, as a matter of law, did not suffer an extreme deprivation that amounts to a constitutional violation.

Even if he could make that showing, Hooks also cannot establish that the defendants were deliberately indifferent. As to Dorow-Stevens, Hooks argues that she knew that he did not have a security mattress during his stay in observation as she specifically documented that he was approved for a kilt, but not a mattress. Hooks further argues that it was documented in his observation logs that he did not have a mattress and that Dorow-Stevens who had access to these logs would have known that he did not have a mattress. As to Cole and Weycker, Hooks argues that he asked them for a mattress and they knew that he did not

have a mattress. Additionally, Hooks argues that although it was not up to Cole or Weycker to approve a security mattress it was part of their jobs to correct unsafe conditions. Looking at the evidence in the light most favorable to Hooks, at most, what Hooks shows is failures to follow policy, unfortunate miscommunications, and assumptions. But these, at best, rise to the level of negligence, which is not enough to establish deliberate indifference. *See Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016); *Estate of Simpson v. Gorbett*, 863 F.3d 740, 746 (7th Cir. 2017) (quoting *Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003)). Summary judgment is granted in favor of the defendants.

## CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment is granted. The defendants also argued that they were entitled to qualified immunity, but because the court granted summary judgment in their favor on the merits, it does not need to address the qualified immunity arguments. Because there are no remaining claims, the case is dismissed.

## ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED** that the defendants' motion for summary judgment (Docket # 36) is **GRANTED.**

**IT IS FURTHER ORDERED** that the case is **DISMISSED**. The Clerk of Court will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. *See* Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension

9

Case 2:22-cv-00811-NJ   Filed 08/29/24   Page 9 of 10   Document 54

and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated at Milwaukee, Wisconsin this 29th day of August, 2024.

BY THE COURT:

_____
NANCY JOSEPH
United States Magistrate Judge